The case for argument this morning is 17-907, University of California v. Broad Institute. Mr. Burrell, good morning. Good afternoon. Good afternoon, and may it please the Court. When the University of California disclosed the necessary and sufficient components of CRISPR-Cas9 in 2012, researchers immediately understood its revolutionary potential as a simple, elegant, and powerful tool for editing genes. In just months, six different groups confirmed what UC predicted in 2012, which was that CRISPR-Cas9 could cleave DNA in eukaryotic cells. All six, including Broad, used only conventional techniques and common sense to achieve that predictable result. Well, I understand, and I understand you were under substantial evidence review, unless you can convince us that there's some legal error here. So on the question, you mentioned the word potential, but the Board pointed us to statements, testimony, declarations that used words like very frustrating, weren't the same, it's not known whether, and various contemporaneous statements made at the time of your invention to point it to the fact that there was no reasonable expectation of success. How do we get around that? So I will answer Your Honor's question directly. Permit me to make a framing point first, if I may, that the question of obviousness here, including the sub-question of reasonable expectation of success, of course, has to be decided on the basis of the entire record. And the question of substantial evidence, even if you're at the question of substantial evidence, is based on the record as a whole. Now, we think there were legal errors with respect to evidence other than the statements that would require a vacatur, and we think even a reversal on this record. But let's focus just on the statements now, but I do want to focus on those other issues because I think they're critical. With respect to the statements, I think a couple things to bear in mind. First, we think that the way that the PTAC treated those statements is inconsistent with the law of the circuit with respect to the proper weight that ought to be given to inventor statements. And I would point the Court, in particular, first to the Medichem case. And this is a case cited in our brief, and that's 437F3rd, and this is at page 1157. And if the Court will permit me, I want to quote the statement that the inventor made in that case, which the Court found was insufficient to overcome the obviousness as shown by the prior art. The inventor in that case said, frankly, I as an organic chemist have no reason to say that there were grounds for expecting anything from the addition of a tertiary amide for the particular step at issue there. I'd also point the Court to the FISR against aptitude. Time out. But the problem with the case you just cited is the fact-finding made below went the other way. See, Mr. Rowley, the problem you have here is you're trying to convince me there's substantial evidence for the outcome you want. I may agree with you, but that doesn't mean there isn't substantial evidence for the outcome the other side found. The case you cited, the fact was decided the other way, and our decision affirmed that that inventor's statement did not require overruling the substantial evidence or overturning the substantial evidence. Do you see the problem I'm having? Here you have to deal with whether there is substantial evidence for the position the PTO did reach. I see Your Honor's point. I don't think it's a problem, and let me try to explain why. First, that standard, the question of whether inventor's statements, how you treat inventor's statements in light of the prior art as a whole, that standard has got to apply the same way no matter which direction it's running in. I guess I don't understand that answer. It seems to me that an inventor's statement made contemporaneously is a piece of evidence, and it is a piece of evidence weighed with all the rest of the evidence. I don't think I understand what role you're giving it, and whether it's something diminished as compared to other evidence or more significant as compared to other evidence. I don't think I understand your position that it has to play the same role no matter whether it's supporting the outcome or refuting the outcome. It's just a piece of evidence. We agree it's just a piece of evidence, and that gets back to the point of why you can't consider, you can't resolve this case just based on the statements alone, which is, I would submit, pretty close to what the PTAM did. If you look, you'll see at the end of its discussion of the statements it says, the evidence of the statements persuades us that there's no reasonable expectation of success here, but then I actually think it's important to remember who has the burden of proof in this situation. This is not a case in which it's coming up to you from the district court in which the patent was found valid, and there's a clear and convincing standard, and the burden's on us. The burden was on the road to show the absence of a reasonable expectation of success, and if one looks at the statements... But the problem for you is that you have multiple statements by multiple of the UC inventors that are pretty strongly worded about many frustrations getting CRISPR to work in human cells. I hope you're sitting down, because CRISPR turns out to be absolutely spectacular. A Harvard geneticist just figured out how to make it work in human cells. So these are all statements that one of the inventors says, a bottleneck in getting this to work in human cells. Now, it turns out there wasn't a bottleneck. It turns out that traditional technologies allowed it to work with relative ease compared to other attempts to move from a prokaryotic environment into a eukaryotic environment. But the question isn't, did it turn out to be easy to do? The question is, what was the perception of the skilled artisan at the time it was done? And so you're trying to give me a lot of ex post evidence, which I'm not saying is irrelevant, but the evidence of your very inventors at the time isn't consistent with the belief that it was going to be done easily, and that's what the PTO had in front of it. So three points, if I may. First, if one looks at the way in which the PTAB analyzed that evidence, in each instance it took a specific quote and it said, this does not convince us that a reasonable expectation of success exists. You can go through that every single time, and that's what they did. In other words, they put the burden on us and not on Broad to disprove. That's point one. Point two, with respect to those statements, I think that really the only fair characterization, and I can go through them one at a time if your honor wants me to, is that they range from neutrality and uncertainty to positive. There isn't a single statement by anybody who says, we don't think this is going to work. And then take the bottleneck statement, for example. This is a related point about- Just because your time is running out, can I move us off of the statement issue? I'd be delighted to do that, because I do think- Well, let me point you in a direction, and you might rather go off on another direction, but there are a couple of kind of legal principles that the board applies, and some of what they said may give someone pause. One of them, for me at least, is in the obvious-to-try context, and their discussion on page 25, and what they say about the obvious-to-try standard. And then there's some other stuff about their juxtaposing motivation and reasonable expectation of success, sort of suggesting if you're highly motivated, then there's no reasonable expectation of success, which is kind of something that I hadn't heard of before. So if you want to address those two, you might have others as well. Yes. I want to focus on two specific areas of law, which I think lead to a deeper area of law, which Your Honor's question identified. With respect to the two specific areas of law, one was that the PTAB ruled that the evidence of what the six other groups did, not just that they succeeded, and not just how fast they succeeded, but how they succeeded, what techniques they used, was irrelevant to the question of reasonable expectation of success. They said it with respect to the Kim Provisional on pages 47 and 48, unambiguously. They said on page, I think it was 23 of their order, that they were going to consider that and said that instead of viewing such work as evidence of an expectation of success, we consider the number of groups who attempted to use it as evidence of motivation. Then at page 32, you will see again, they say, they quote an inapposite case about the inventor's own state of mind to say that this evidence is irrelevant. I would submit respectfully it is the most relevant evidence, and going back to something Judge Moore said earlier. Did they actually say it's irrelevant? Irrelevant. That's the quote from Life Tech, irrelevant. On page 47, Kim Provisional has no relevance to this proceeding. With respect to Kim, I thought you were saying that they said that all these The Kim Provisional is one of the examples of evidence that we submit. But I thought the Kim analysis had something to do with a different issue. They didn't say that all of those subsequent very quick. Well, they did. With all due respect, I'm sorry to interrupt, but I think on page 32, that's exactly what they're saying. They say, you see points to this body of evidence. We don't think it defeats a reasonable expectation of success. It's irrelevant what an inventor thought before the inventor carried out the experiment. And I think, first of all, that's just wrong on the basis of Well, time out. Unless I'm mistaken, what they are quoting is our Life Tech decision. It doesn't seem to me that the PTO stated something was relevant or irrelevant. They're directly quoting a Federal Circuit decision, right? Am I right? Am I mistaken? Is there another place other than the sentence on 32, which is the quote from Life Tech? So let me address that, and then I'll show you the two other places if I could. With respect to this, the prior sentence, which is not a quote, which is the PTAB saying, The ultimate results of an experiment do not indicate what one of ordinary skill in the art would have thought before the experiment was performed. That's wrong in two ways. First, if you look at Ecolachem, you look at Martin, you look at International Glass, you look at Trustees of Columbia, they all say that that is strong evidence that must be considered when present. So that's just an error on its own terms. But there's a more basic point here, which I think is absolutely critical, which is that we didn't introduce this evidence just to show success or the speed of success. We introduced this evidence to show that nothing more than conventional techniques and common sense were needed to succeed. And with respect, that's not post-hoc evidence. That is the best possible contemporaneous evidence of what persons of ordinary skill in the art in 2012 thought. All of them took off-the-shelf conventional techniques, techniques that the PTAB itself on page 35 held were conventional techniques known to persons of ordinary skill in the art, applied them without any modification, any variation, any need to try to address any anticipated particular problem to achieve successful results. That is powerful evidence that goes, as Ecola Kemp said, to the level of knowledge of a person of ordinary skill in the art, which is the baseline for evaluating a reasonable expectation of success. That's just a clear, absolute error. And I think the other legal error, I think, as clear as can be, is the PTAB's ruling that it was going to require here specific instructions particular to the implementation of CRISPR-Cas9 in the eukaryotic environment. That's just a flat-out violation of the rule set forth in KSR. It's exactly what KSR said that you can't do. I think you can find those requirements of specific instructions on pages 28 and 29, and again on page 45. Well, on page 28, it says, these cases instruct us whether or not one of skill in the art would have had a reasonable expectation of success, and it depends on the specific nature of what was known from the prior art about closely related subject matter. Now, you don't have a problem with that sentence, do you? I don't have a problem with that. No, but it's where it leads. Specific instructions that are relevant to the claimed matter or success have directed findings of a reasonable expectation. Do you think that means the opposite? No, but what I do think it means, and it gets to Chief Judge Prost's question from earlier about the way in which the PTAB went about its analysis here, the PTAB goes through a whole list of this Court's prior cases, some in one bucket finding reasonable expectation of success, others rejecting it, and then it purports to define a rule. Go ahead. I'm sorry. Just wait a minute. Just excuse me for a second. Your Honor, I'm... Continue. It's piped into that. Okay. What the PTAB did was go through that list and then purport to define exactly this division that Judge Moore's question pointed to. But if you look at those cases, all but one of the cases in that list that find no reasonable expectation of success are pre-KSR cases that are applying the teaching suggestion or motivation test. And the only one that isn't is a case where there is specific prior art, the Pasteur case, pointing teaching away. And so I think really what you're seeing here is what the PTAB did, and I'm looking at these cases, relying on cases that now invoke an approach that the Supreme Court has rejected, and defining a rule that says basically what we're going to do is look for specific instructions in certain situations. But that rule really has no basis. It has no basis in the law. It has no basis. It's inconsistent with KSR. Well, the only problem is whether or not they really did. I mean, just going back to Judge Moore's point, where they really said that in the absence of specific instructions. Again, I think the place to look there is they're holding at page 45, which says, the preponderance of the evidence cited by Broad persuades us that there would not have been specific instructions relevant to CRISPR-Cas9 to give one ordinary school in the art a reasonable expectation success would work in eukaryotes successfully. And I think essentially what happened here is that the PTAB took that body of case law and said, well, KSR is going to apply in certain circumstances, but in other circumstances we go to a totality of the circumstances kind of analysis. But I really think that that's completely inconsistent with what this circuit said in Kubin. And I really think that the analysis here is set forth in Kubin, that in a situation in which there is motivation, where it's obvious to try, basically to see whether, as KSR said, there are a finite number of solutions, there's motivation, there are a finite number of solutions, and the person of ordinary skill in the art uses one of those finite number of solutions to achieve the anticipated result. The other side of the spectrum is a situation which, Kubin quoting the O'Farrell case, says a situation where the inventor would have had to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result where the prior art either gave no indication of which parameters were critical or no direction as to which of the many possible choices is likely to be successful or later on to explore a new technology or general approach that seems to be promising. This case is nothing like that situation. There are a handful of conventional techniques, the ones that PTAB validated as within the knowledge of a person of ordinary skill in the art at page 35 of the order. The nucleic targeting, the codon optimization, the direct injection, those are the exact techniques that the Broad used and no others and they're the exact techniques that every other one of the groups used and that's powerful contemporaneous evidence of exactly what a person of ordinary skill in the art thought would be needed to solve the problem of trying to introduce CRISPR-Cas9 into eukaryotic cells. I think it's quite striking, I would urge the court to take a look at this chart which appears in volume 7 of the appendix and it's in particular pages 5177 through 5179. If you look at it, you'll see that you just kind of go down the list and see they all do exactly the same thing. They all use exactly the techniques that the PTAB found were conventional techniques. If you look at page 5179 for example, they all use codon optimization except for one who didn't even need it. They all use the NLS, they all use vectors. These are the tools that the PTAB itself said are within the knowledge of a person of ordinary skill in the art. They all used them, none of them thought that there was a problem of the kind that the PTAB hypothesized. The PTAB hypothesized based on Dr. Simon's expert testimony that well, because some other systems had required variations in order to account for unique conditions that a person of ordinary skill in the art wouldn't have had a reasonable expectation of success that you could introduce CRISPR-Cas9 into your eukaryotic cells because you would have been worried about these unique conditions. But the reason I think it was such a grave error on the part of the PTAB not to look at this evidence as relevant to the question of expectation of success is that it refutes that inference. It shows you that confronted with this exact question, people of ordinary skill in the art did not vary the parameters, did not try to design around this hypothetical problem. There's any hindsight here. The hindsight is in that PTAB analysis taking an expert who several years after the fact said well, you know, a few years ago they would have been worried about these things. Well, look at what the people actually did at that time. They weren't worried about those things. Well, you're way over your time. We'll reserve some time for rebuttal. Thank you very much. Good afternoon. Good day to the court. Your Honor, UC's argument focuses on the wrong time period for assessing obviousness and recollection of expectation of success. It looks to whether in hindsight after experiments were done, whether it took what they were calling innovative techniques to get to the invention. But that is not the proper inquiry. It's what OPOSA thought at the relevant time before the experiments were conducted. We heard counsel just say that everybody designed their test with the expectation it would work. There's not a shred of evidence on that anywhere in this record. They rely on six groups. One of them are the UC inventors. The UC inventors, as Your Honor made the point. Well, the question is what the test was that the board applied to all of these statements. I mean, we failed to see how no guarantees, you know, they relied on the fact there were no guarantees. As your friend pointed out, they seem to rely on the need for specific instructions. So the question, if we step back a minute, certainly we know there may be competing statements and maybe your friend loses because of the substantial evidence review. But tell me the question of why the things that have been pointed out don't suggest that the board may have applied the problematic standard. Okay, let me start with the no guarantee and then I'll go to the specific instructions. On the no guarantee, the PTAB recited the reasonable expectation of success standard 30 times in its opinion. Never once did it say that it was requiring a guarantee. In fact, its only mention of certainty was to point out that it is not required at appendix pages 12 and 13. The PTAB relied on the statement that Dr. Carroll said contemporaneously that there was no guarantee that the system could access the chromatin. But in that article, they also relied on the statements that there were problems that RNA issues, the RNA might get chopped up. They relied on statements that it might be toxic to the system. At appendix page 18, the PTAB relied on Dr. Carroll's statement  that the results for other systems were, quote, discouragingly low, close quote. That's on appendix page 18. It's not just the no guarantee. Dr. Carroll wrote an article contemporaneously with the Genic20Tel publication and said the results of other systems have been discouragingly low. This thing might get eaten up with the RNA defenses. It might be toxic to the cell. There's a whole lot of concerns here. He never once said, I think this is going to work at all. And the PTAB made the affirmative finding, according to what counsel said, that on appendix 19, the only conclusion we draw from Dr. Carroll's statement is at the time he did not have a reasonable expectation of success the system would work. Not a neutral thing. There was no burden put on them. Yeah, but those statements are preceded. Move up a few lines there. We fail to see how no guarantee indicates an expectation of success. That's kind of the burden is on you all, not on them. And then they go on to say correctly, although there need not be absolute predictability, at best, Dr. Carroll's statement, I guess they're talking about the statement that there are no guarantees, highlights some specific reasons why CRISPR's system might fail. Thus, the only conclusion we draw from his statement is that at the time he did not have a reasonable expectation. That seems really kind of skewed, right? I mean, maybe there was some on one side and some on the other, but that seems quite strong. Well, Your Honor, on the prior page, they point out the fact that if we go to appendix page 18, they say Dr. Carroll also, excuse me, at the top of the page, they quote at line 2, the idea of the RNA hydrolysis. That's where the RNA can get chopped up by the system. He also raised technical questions about whether CRISPR could be used successfully in the same commentary. He pointed out the potential need to enhance the activity of cleavage in eukaryotic cells while cautioning about the risk of undesirable side effects. The no guarantee only to do with the chromatin. The side effects would be just chopping up the cell itself and killing it. And then they go on, and if you look at this, Your Honor, at appendix 18, there's this quote here, and it says that, second line, the efficiency of modification by introduction of simple oligonucleotides, it goes on, remains discouragingly low in most cases. So they're not just going with the no guarantee about chromatin. They say that his statements in this article, they're referring to all of these things. He lists out three major concerns. Chromatin is the one they said no guarantee about. Toxicity to the cell, RNA chopping up, getting chopped up for the system, and that the results in other types of systems like this have been discouragingly low. That is telling the reader, we have not had much success with any of these kinds of systems in the past. It doesn't even conclude, and maybe it's apples and oranges, but the citation they have at the middle of page 18 concludes with, whether the CRISPR system will provide the next generation of targetable cleavage reagents remains to be seen. But it is clearly well worth a try. That's right. Stay tuned. That's right. And he's just told the readers that the other ones that have been worth a try, there's been many systems that have been worth a try. And the results of those, as he points out, five lines through. There's no teaching away here, right? There's no teaching away argument. No, there's no teaching away argument, no. But he's telling the readers in that same paragraph, keep in mind the results of prior experiments in these types of systems have been discouragingly low. And this is the board considered his statements in the view of the entire record here, including the statements of the inventors, to see were people thinking this had an expectation of success. They reviewed the Carroll article in its entirety and said, we think Carroll had no expectation of success. Certainly nothing positive. Yes, there was a motivation, but that is it. What about the board's not giving much emphasis or not placing much emphasis on all the simultaneous inventions going on, the stuff that all, by coincidence or whatever, five, seven people, whatever, came up with this within a very short period of time? If I could take just like 30 seconds first to address your second question about the specific instructions and then jump to it. Sure, I'm sorry. Just want to turn, Your Honor, to appendix page 28. I'm sorry, 28? Yes, 28, Your Honor. And this is after the board has analyzed 11 of this court's decisions. And Institute Pasteur is one where this court said that the KSR decision does not take away the requirement for a reasonable expectation of success. And they acknowledge at line 20, the availability of only generalized instructions and evidence of failures have indicated the opposite. So they say, we look to general instructions as well. And above that said, specific instructions can be relevant. And they then spend 10 pages going over what the record has been using general instructions. And they make a finding at appendix page 45 and 46, based on the RNA-based systems, that the failures have demonstrated there's no expectation of success. So they're applying that standard. How have prior systems worked with generalized instructions? Every single RNA-based system of record has failed. That's their finding. And that's because they acknowledge under this court's precedent, you can use general instructions. But in this situation, it's a fact finding. They found they'd all failed. So they did not ignore general instructions. They looked at them. Every general instruction that the other side put forward. Turning to the evidence of simultaneous invention, the PTAB did not dismiss that as being legally irrelevant. If we turn to appendix page 19, first of all, they acknowledge that this evidence is put in the record. And we're at line 7 at appendix page 23. And they say that UC alleges that because some research groups were immediately able to use it, there was a reasonable expectation of success. And they go on and they say, regardless of how many groups achieved success in eukaryotic cells, we are not persuaded that such success indicates there was an expectation of success before the results from these experiments were known. They don't say they're irrelevant. They actually are analyzed to see in this situation, because this court has said, in the Lindeman case, that simultaneous invention, quote, may or may not be an indication of obviousness. But if the person undertaking the invention believes, thinks it will yield that that is evidence? Excuse me, Your Honor. If the person undertaking that act believes it's going to yield success, then it would be relevant. Yes, it could be relevant. That's right, Your Honor. Okay, and then how do you juxtapose that with the statement the board has on page 24, which says we are not persuaded that a scientist's belief in the success of his or her own experiments is necessarily a reasonable expectation of success that indicates obviousness. Were this true, the requirement for reasonable expectation of success in the context of sub-traumatic that would have been obvious to try would be rendered meaningless. So isn't the board saying there that they are not going to consider whether a scientist believes there's reasonable expectation of success, essentially because every scientist does, or they wouldn't undertake it? I don't really understand this. I'm not that clear on what they were saying in that. But isn't that your read? What's the point of that? What they're getting to, Your Honor, is at the top of the page. You see made an argument that— No, no, no. But look at this, if you wouldn't mind. Just look at the second. Are you top of page 24? Yes, Your Honor. I'm at top of 24, Your Honor. The argument you see made below was that because the research groups undertook the experiments, they necessarily had an expectation of success. That was their argument. They didn't come in with any evidence from any of the groups and said, we believe pre-experimentation, the before, that there was an expectation of success. Their argument was, we don't have any evidence on that. So we want you to conclude, PTAB— Wait, where were they saying that? What are you referring to here? Okay, it says, UC argues that the research groups that were reportedly top of the page— sorry, Your Honor—successful after the publication could not have undertaken the use of the type 2 systems unless there was sufficient motivation and expectation of success. So they say— So you understand when the PTO uses the word necessarily in line 18, they're not saying it's not relevant. They're not saying they're not considering it. They're just saying it doesn't necessarily— That's right, Your Honor, and that was their only argument. That may be my only sentence, this argument. I appreciate that, Your Honor. That was the point there. At the top of the page, the PTAB is going over UC's only argument in their brief as to why this showed an expectation. They said, you wouldn't do experiments unless they necessarily— you necessarily thought they were going to be successful. And so they go on and say, no, that's not the case here. And by the way, once again, Your Honor, one of the groups they said that supposedly had this pre-experiment expectation of success was the Doudna group. And we know Doudna said, I thought this wasn't going to work. She said there was a big problem. Okay, but so the board's treatment of the simultaneous actions starts at page 23 and runs through page 25, right? That's right, Your Honor. So one of their reasons is they reject UC's argument because it doesn't necessarily provide a reasonable expectation. And the only other point they seem to be making is taking the KSR quote with regard to obvious to try, and even though the quote says it is likely the product not of innovation or whatever, they restate it to say may show it would have been obvious. And then I don't understand the second sentence starting at line 10 of page 25, really. I mean, there again, they're making this sort of necessarily. Well, we can't adopt what KSR says, but we can't say that it would always necessarily be the case. So, I mean, I guess their analysis seems to be taking the extreme and saying that it wouldn't necessarily be so, but that doesn't, in my mind, provide a very fulsome analysis of really what the issue is with regard to these simultaneous inventions. I think, Your Honor, what you're seeing in the PTAB decision is the PTAB's not saying that you show it's necessarily so. It's that UC was arguing that if you undertake the experiments, this is a continuation of the UC argument. So the UC was arguing necessarily just because they took the experiment. That was Zerk's argument, Your Honor. So they didn't have to say anything else about the kinds of arguments that have been raised on appeal here about the importance or the significance of simultaneous inventions or what? Your Honor, they didn't mention the word simultaneous inventions. So you're saying it's sort of a waiver-art thing, that they didn't make the kind of arguments they're making here on appeal about the importance of these? Your Honor, they did waive to the extent they say that simultaneous inventions should be used or secondary considerations. What they raised it for below was that the fact that these groups undertook the experiments meant they had an expectation of success, and that is not the case. So the board addressed the argument that was being made. The argument made was, and that's what they're explaining on appendage page 24, is that UC is telling us that because they undertook this experiment, it necessarily meant they expected success, but someone wouldn't go in a lab and do an experiment unless they thought they were going to be successful, and they were rejected. So the board says it's not necessarily true, it's not always true, and the last sentence says, thus we look at the specific context of the art at the time. Then they spent the next 15 pages going painstakingly and detailedly through the art at the time and the record evidence. That's correct, Your Honor. And they go through and they look at what the attempts were with RNA-based systems, and there's three RNA-based systems, just three, that had any kind of ability to go into eukaryotic cells. Riboswitches, right? Ribozymes and the group 2 introns. And the group 2 introns, Your Honor. But all three of them required innovative techniques to make them work in the more complex animal and plant cells. They didn't just convert over easily. That's right, and very important to that, Your Honor, general instruction didn't work, and each one of those three required a completely different approach. So you couldn't take what was learned from one and apply it to the next or to the CRISPR. And that's why we have all of these statements from Carol and from Doudna, and Dr. Simmons, our expert, saying that there be no expectation of success because everybody was aware of these prior failures when you tried to apply conventional techniques, and they were aware of the fact that if you were going to come up with something, it could take years to get something like the group 2 introns, 16 years of effort, where all these conventional techniques and the system ended up being unusable. That's in appendix page 38, 16 years of effort. That's what APOSA was aware of at the relevant time here. Can I just ask you a completely different question, which is about the cutoff date? If the board had used the prior cutoff date of October 2013, would you lose? If you used the cutoff date of October 2013, I think the board, no, we wouldn't lose, Your Honor. The board would have to. You would not, I'm sorry. No, we would not lose. Because the board would then resolve the issue of whether we're entitled to a 12-12-12 date, and the answer would be yes to that. And I would also point out, in other words, the board did not feel the need to get to whether or not we were entitled to the date of October 12, 2013. Well, certainly by October 2013, one skilled in the art would have had, in light of UC's claim, a reasonable expectation of success, right? Yes, Your Honor. That's correct. My point is, though, if you went with that date, then the board would necessarily have made the determination as to whether or not we could go back to the 12-12-12 date. But they didn't need to, because both parties agreed to use that date in these motions. In fact, the other side embraced the fact, as part of its simultaneous invention argument, that Broad had made the invention by October 5, 2012. It's actually in the appellate briefs here. There's a table they put together saying that Broad rapidly came to the invention, and they cite our date as October 5, 2012. Your Honor, just in closing, I'd like to point out that this is a situation where substantial evidence supports the decision here. And the other side is simply asking you, Your Honors, to second-guess the PTAB's decision, which should not be done, and we request affirmance. Thank you. Thank you, Your Honor. A couple of corrections to start. My friend said that the only argument that UC made before the PTAB was that anybody who conducts an experiment necessarily has an expectation of success. I think that it is true that that's one of the arguments that UC made. It's an aggressive argument. We're not making it here, but it is completely wrong to say that it's the only argument that UC made. And I would ask the Court to read pages 235 to 255 of the appendix, which goes through our arguments. And the key one is a carryover paragraph from 245 to 246 in which we make exactly the argument there that we are making here, which is a different argument and which I think is critical, and it goes to the core of what's at stake here and the core of the error that the PTAB made. What we were saying to the PTAB was the most powerful contemporaneous evidence of what a person of ordinary skill in the art would have thought, and therefore of the expectation of success, is what the scientists in these six groups actually did in that exact moment in 2012. And none of them felt any need to innovate around these supposed unique conditions that several years later Brode's expert hypothesized people would have thought about. The evidence in the moment shows that nobody thought that was a problem. And the PTAB did refuse to consider that evidence as going to the issue of reasonable expectation of success. We were talking about page 23. The PTAB definitely says on page 23, instead of viewing this evidence as relevant to reasonable expectation of success, we view it as relevant to motivation. They specifically say that right in the middle of the page. Now, another point I want to correct about these other three systems we've been talking about. There's sort of two points to make about that. One is a basic point, which I think does show you at some level how far off the rails this whole PTAB analysis went. My friend, Mr. Nimrod, says that these other three systems that Judge Moore identified were failures. I'd like to give the court three sites to the record, each of which will demonstrate that these three systems were successful. The first, with respect to ribozymes, that's 5890. You'll see a quote from the relevant article, which talks about the consistently high levels of activity and the success with utility in medicine for that. If you look at ribos... Yeah, but page 5893 says, unfortunately a number of factors intervened to prevent many engineered riboswitches from becoming useful genetic switches, for example. And it goes on to explain a multitude of problems that occurred to get from the eukaryotic. Which one's bacteria? Prokaryotic. A number of problems between the prokaryotic to the eukaryotic. But 20 years ago and all solved. And then with respect to riboswitches, 5309, Dr. Simon admits successful. With respect to group 2 introns... They were ultimately successful, but after time and effort and innovation to figure out how to take them from the bacteria to the plant. This gets to, I think, is the key point. Really the key point here. Which is that based on that evidence, Dr. Simon hypothesized that a person of ordinary skill in the art in 2012 would have assumed that with respect to CRISPR-Cas9, there would be similar needs for unique tailoring and therefore they wouldn't have had a reasonable expectation of success. What the evidence of the PTAB did not consider going to expectation of success, the evidence of what these six groups did, shows you that that is not what people of ordinary skill in the art thought at the time because they made no effort to anticipate and design around those kinds of problems. And of course they would have if they thought that they were going to be an impediment to success because this was like the California gold rush of 1848. People are trying to get there first on this. And they would of course try, if they really thought this was going to be a problem and impediment to success, of course they would have designed around it. None of them did. The PTAB never considered that evidence as relevant to reasonable expectation of success. And I just think that's a key legal error. And I do also think, if I may just make one more point, it ties back to the whole specific instructions point too. The reason, and this is, you can see this at page 39 of the PTAB, but the reason the PTAB said this was a situation in which specific instructions were necessary in order to have a reasonable expectation of success was because of the difficulties with these three prior systems. Even those difficulties and the need for unique conditions, unless there were specific instructions dealing with the unique conditions of CRISPR-Cas9, there wouldn't be reasonable expectation of success. Again, the evidence of the six groups refutes that inference because all of them faced with this problem took the conventional off-the-shelf techniques, codon optimization, the NLS, all of the conventional techniques at the PTAB. And you know what they did with ribosomes and riboswitches? I'll tell you because I know you don't. They started with conventional techniques. And guess what? They didn't work. So it took years and innovation. That's how science works, Mr. Borrelli. You start with the conventional techniques and then when they don't work, you spend the time, energy, and money coming up with a new technique. So the fact that they started with the easiest off-the-shelf stuff doesn't mean they thought it would work. It means it was what was most readily and easily available to them at the time, the least cost and the least effort. Let's rule out the easy stuff first before we spend the time and money designing around. Respectfully, Your Honor... But that's what the board found, Mr. Borrelli, and it's hard for me to say there's not substantial evidence for that. Respectfully, Your Honor, there is not... Don't interrupt me when I'm speaking. I apologize. I didn't mean to do that. I'm sorry. Mr. Borrelli, I didn't get the last page cited. You gave 5890, 5309, and then there was one... 5924. Okay, thank you. Okay, we're going to conclude. Thank you. Thank you. We thank both sides of the case. All rise.